[Civ. No. 22797.   Second Dist., Div. Two.   Nov. 3, 1958.]

ANTHONY HOWARD BROCATO, Appellant, v. STANDARD OIL COMPANY OF CALIFORNIA (a Corporation) et al., Respondents.

*Assigned by Chairman of Judicial Council.

William P. Nutter for Appellant.

Dryden, Harrington, Horgan & Swartz and Vernon G. Foster for Respondents.

HERNDON, J.—Plaintiff appeals from a judgment of nonsuit in favor of defendant Standard Oil Company of California rendered in a personal injury action. His counsel concedes that respondent must prevail unless the doctrine of res ipsa loquitur is applicable.

The review of the evidence herein will be governed by the rule stated in *Lashley* v. *Koerber*, 26 Cal.2d 83, 84 [156 P.2d 441] : ''Under well-established rules we must, in considering whether the judgment of nonsuit was proper, resolve every conflict in their testimonies in favor of plaintiff, consider every inference which can reasonably be drawn and every presumption which can fairly be deemed to arise in support of plaintiff, and accept as true all evidence adduced, direct and indirect, which tends to sustain plaintiff's case.''

Shortly after 7 a.m. on September 27, 1954, plaintiff was working as a brakeman for Pacific Electric Railway Company[1]

---

[1]Originally a defendant herein, that company is not involved in this appeal, having obtained from plaintiff a covenant not to sue.

which has service tracks upon the premises of respondent's refinery at El Segundo near Los Angeles. At the time of plaintiff's injury he was working as pin man in the storage yard on respondent's property, assisting in pulling out freight cars and separating them. He was at a switch leading into the adjoining yard of the Union Tank Line Company in which damaged tank cars were repaired. Apparently he was on or near the ground. Suddenly his throat became dry and started to burn, he wanted water, started to cough, became very sick and started to vomit. He did not see, hear, smell, or otherwise identify the cause of his trouble. Taken to the yard office and then to the dispensary he vomited at both of those places. Later, at the Pacific Electric Railway Hospital, he developed a red rash on his body. Appellant further testified that he still had the rash at the time of trial (January, 1957), a swelling and dryness of the throat, head pains, headaches and dizziness; was very nervous; body dry, peeling and scaling.

On the same occasion when plaintiff was stricken T. H. Coffman, another brakeman, who was working about six to eight car lengths from plaintiff, was similarly affected. He testified that they were in something that appeared to be gas which had a "choking effect" on him and affected his breathing; he noticed it most when on a box car and less when on the ground. He immediately developed a sore throat and was off work for eight days due to that ailment. E. J. Smith, the yard master, went to the dispensary with plaintiff and was treated there, receiving approximately the same treatment as plaintiff.

Dr. Gundrum, an ear, nose and throat specialist, diagnosed plaintiff's trouble as acute laryngitis, acute pharyngitis, acute rhinitis and acute sinusitis. He also said these lesions in the throat and larynx were due to some chemical irritant which had been inhaled. Plaintiff had worked for the Pacific Electric for 15 years and on many occasions had labored at this Standard Oil plant but never became sick or affected as he was on this particular day of September 27, 1954.

Plaintiff testified that on the morning in question "there was quite a bit of fog in the air" and that visibility was "quite low." Located about 1,000 to 1,500 feet easterly from the place where plaintiff and his coworkers were stricken there was a chimney or "stack" which extended "some 150 feet into the air." This "stack" was referred to in the testimony as a "waste burner" and was a part of defendant's oil refinery. Plaintiff's testimony concerning the incident in ques-

tion included the following: "A. Well, I don't know just what kind of accident it was. I was there working in the field, and I got my—my throat started to burning, and I got awfully sick, and I started to vomiting. . . . Q. And is it your testimony that when you first became aware of any symptoms that you did not smell anything? A. I did not. Q. No odor at all? A. That is right. Q. You didn't smell any gasoline or oil or anything like that? A. No. . . . Q. You were not aware of any vapors or fumes in the air? A. No. Q. You saw nothing; is that correct? A. No. Q. Now, are you absolutely certain that at the time that this particular thing occurred that you didn't smell the odor of sulphur in the air? A. There was no odor to be smelled at that time at all. Q. At any time before you left the yard did you smell sulphur? A. No."

Mr. E. J. Lange, a chemical engineer, was called by plaintiff as an expert witness. After relating considerable experience in connection with oil refining operations, Mr. Lange testified concerning the various types of gases that may be produced in connection with the manufacture of petroleum products. These included methane, ethane, propane, butane, pentane, hexane and others. All of these gases are heavier than air except methane and ethane. When asked whether any of the six named gases are poisonous, the witness answered: "It depends upon the concentration. . . . I have tested in the oil fields the first six of those gases in the oil well gas, and I sometimes got sties and sore throats." Later in the record of plaintiff's direct examination of the witness Lange, the following appears: "Q. BY MR. NUTTER: What do we mean, Mr. Lange, by a waste burner? A. A waste burner burns the excess gas from distillation or cracking processes that cannot be burned under normal operating conditions, under stills or boilers. There are sometimes excessive amounts of gas produced, and they are diverted to the burner lest the heat in the furnaces of the boilers and the stills be upset. They want a steady heat for steady operation, so the excess is taken care of and goes up the stack and is burned. Q. Are there various kinds of waste burners? A. Yes. Q. Describe a typical one for the jury, will you, please, sir? . . . MR. ROBINSON: I object to that as incompetent, irrelevant and immaterial, and outside the scope of the issues of this case." After sustaining the objection, the court stated: "You may have him describe any type apparatus that you expect to show is involved in this particular case."

At this point counsel for plaintiff interrupted the direct

examination of the witness to explain to the judge that the witness had not examined defendant's installation. Referring to Mr. Lange, counsel stated: "I have my witness here who can testify with respect to how this particular stack *might* operate, but he has never seen the stack himself." (Emphasis added.) After making this explanation, counsel requested an order permitting Lange to make an inspection of defendant's plant ". . . so that we can look at this stack and properly describe it to the jury." After discussion had developed the undisputed fact that plaintiff's counsel had not sought any inspection prior to the commencement of the trial, the judge declined to recess the trial for this purpose.

Thereafter, the direct examination of Mr. Lange was resumed, the following being a portion of the record thereof: "Q. By MR. NUTTER: Mr. Lange, speaking generally of all types of waste burners, could you describe how they operate? A. The waste gas is introduced to the bottom of the stack with air to combust on the way up through the stack, and there's a pilot light usually at the top of the flare to ignite it in case for some reason or other the mixture should not be right at the bottom, it needed more air, at the top the flare would ignite the gas again. Q. Would that operate in the same manner, for example, as a pilot light on a kitchen range? A. Yes, that is right. Q. If the pilot light were to be extinguished for any reason at all what would happen to the gases, sir? MR. ROBINSON: I object to the question again as assuming facts not in evidence, and calling for speculation on the part of this witness. THE COURT: Overruled without prejudice. This witness is here in a sense out of order, and that's the reason that in order to expedite these proceedings, and unless this testimony is connected up later on you may renew your motion to strike. THE WITNESS: The flare would go out if it was too lean or too rich in oxygen, and in that case the vapors being heavier than air would rise through the stack and come down around and surround the country less there was a strong wind blowing it away; they would settle. Q. By MR. NUTTER: Now, with respect to these various gases that you have described, sir, are they all heavier than air? A. All except methane and ethane. They are lighter than air. Q. Assuming a rather dense or heavy fog in the air in the area of a burner, and assuming that the pilot light had become extinguished, what, generally, would be the result with respect to the formation of the gases as to the earth? MR. ROBINSON: Again, I'm going to object to the question on the grounds that there's no foundation laid

that the burner that we are talking about is the same as the witness has in mind, and more importantly that it assumes facts not in evidence, and I take it that I may have a running objection as to that part? THE COURT: Well, the question as I understand it relates to all burners, which I assume would include the burner here in question, and that was the basis of his original premise. The objection is overruled without prejudice, and subject to a motion to strike in the event it is not connected. . . . THE WITNESS: The gases coming through the top of the flare would be cooled by the fog so they would settle more rapidly, and in a refinery where there's no movement anyone can smell the greater concentration of vapors that settle in the low places and tend to lay down, they tend to settle in the low places. THE COURT: You say these gases can be smelled? THE WITNESS: Yes.''

At the conclusion of the direct examination, counsel for defendant moved to strike the testimony of Mr. Lange ''. . . as to all matters concerning the burners on the grounds that they have not been connected up to any other installations or burners that are in issue in this case, and, therefore, are irrelevant and immaterial to any of the issues in this case.'' This motion was granted. Plaintiff thereupon rested his case and defendant moved for a judgment of nonsuit. In granting the motion the trial judge commented: ''. . . in the state of the record it seems to me that this jury is going to have to speculate as to where these fumes, if there were fumes, came from, what caused them to be there. The testimony of your witnesses, excluding the history given the doctor, is that they didn't see anything, they didn't smell anything, they didn't hear anything, just suddenly started coughing and felt irritation.''

Plaintiff's sole contention on this appeal is that he established a prima facie case in that the evidence which he introduced was sufficient to invoke in his favor the doctrine of res ipsa loquitur. He does not question the correctness of any interim ruling of the trial court. In his opening brief he states his position as follows: ''Appellant suffered injury to his respiratory system and to other portions of his body while within and upon the premises under control of the respondent. He saw nothing. He smelled nothing. He relies upon the doctrine of res ipsa loquitur for proof of breach of duty or negligence on the part of respondent. If the doctrine is not applicable to the facts here presented, then the respondent must prevail as to this appeal.''

■ The elements essential to the application of res ipsa loquitur are well settled by the decisions. The following summary of those elements is quoted from *Snyder* v. *Hollingbery*, 141 Cal.App.2d 520, 528 [297 P.2d 485], cited in appellant's brief: " ' (a) There is a basis of experience, either common to the community or brought out in evidence, from which it may reasonably be concluded that the accident is of a kind which does not normally occur unless someone has been negligent. (b) It must be caused by an agency or instrumentality within the exclusive control of the defendant. (c) It must not have been due to any voluntary action or contribution on the part of the plaintiff.' (*Bauer* v. *Otis*, 133 Cal.App.2d 439, 443 [284 P.2d 133].)' '

■ In the course of a comprehensive review of the doctrine as applied in California, the Supreme Court recently stated the law as follows in *Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436, at page 443 [247 P.2d 344] : ''The defendant, of course, should not be liable unless it appears from all the facts and circumstances that there is a sufficient causal connection between his conduct and the plaintiff's injury, and it has been held that res ipsa loquitur will not apply if it is equally probable that the negligence was that of someone other than the defendant. [Citations.] ■ As said in the LaPorte case, *supra* (33 Cal.2d at p. 170 [199 P.2d 665]), the doctrine is not applicable where it is 'at least equally probable that the accident was caused by some fault . . . for which defendants were not liable' and where 'it cannot be said that it is more likely than not that the accident was caused by the negligence of *defendants*.' (Italics added.) ■ In dealing with this problem the courts have usually said that the defendant must have 'management' or 'control' of the agency or instrumentality which caused the injury. [Citations.] It has been stated that the purpose of this requirement is to eliminate the possibility that the accident was caused by someone other than the defendant.' '

*Hernandez* v. *Southern California Gas Co.*, 213 Cal. 384 [2 P.2d 360], cited in the foregoing quotation from the *Zentz* decision is factually more similar to the case at bar than any case which we find cited in the briefs. In reversing a judgment for the plaintiff, the Supreme Court said (page 388) : ''The plaintiff also makes the contention that the doctrine of *res ipsa loquitur* applied and he cites *Smith* v. *Southern Counties Gas Co.*, 89 Cal.App. 81 [264 P. 532]. But in that case the injured person at the time of the injury was standing in a pit in which

the gas company had its pipes located. Both the plaintiff and the defendant in the case at bar concede that *Judson* v. *Giant Powder Co.*, 107 Cal. 549 [48 Am.St.Rep. 146, 29 L.R.A. 718, 40 P. 1020, 1021], states the rule correctly when the court quotes from Shearman and Redfield on Negligence as follows: '*When a thing which causes injury* is shown to be under the management of the defendant, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from a want of care.' The italicized words present the very question before us, to-wit, *what caused the injury, defendant's gas or some other explosive? Not until it is shown that the defendant's gas caused the injury can the doctrine of res ipsa loquitur be relied on.* (19 Cal.Jur. 708, § 125.)'' (Emphasis added.)

▮ ''The doctrine does not apply when the injury *might* have been caused by plaintiff's negligence or have been due to one of several causes, for some of which the defendant is not responsible.'' (*Hogan* v. *Miller*, 153 Cal.App.2d 107, 115 [314 P.2d 107]. See also *Nelson* v. *Douglas Pedlow, Inc.*, 130 Cal.App.2d 780, 784 [279 P.2d 823].)

▮ The doctrine of res ipsa loquitur never has been regarded as a substitute for satisfactory proof of causation.

▮ As stated in 65 Corpus Juris Secundum 1010, section 220: ''. . . there can be no foundation for the application of the doctrine where the physical act or thing which caused the injury is unknown or not disclosed or identified. Accordingly, it has been held that the doctrine is inapplicable where the injury might have been brought about by one of two or more causes, neither of which is included or excluded by any affirmative evidence.''

▮ Applying the above stated principles of law to the instant case, we conclude that the trial court ruled correctly in granting the nonsuit. Plaintiff failed to prove any fact from which a legitimate inference could be drawn that defendant probably was responsible for the unknown and unidentified substance (presumably gaseous in nature) which caused plaintiff's illness. The source of the unknown gas was left a matter of sheer speculation. Plaintiff's counsel, himself, recognized the insufficiency of his evidence to identify defendant as the producer of the offending gases when he made the following declaration in support of his tardy request for an inspection: ''MR. NUTTER: Of course, your Honor, you

probably would surmise that I'm going to ask for the res ipsa loquitur instruction. *Now, I don't know whether the gases came exclusively from this stack, or whether they came from other stacks. It is utterly impossible to know. I wanted to get some evidence in on it.* The plant is one which is not accessible, and you can't even see this stack from any spot.'' (Emphasis added.)

The above quoted concession of counsel for plaintiff, made shortly before he rested his case, is consistent with common knowledge that noxious fumes and gases capable of causing illness may be produced by a great variety of industrial operations; that various gases and air pollutants emanating from different sources, industrial and otherwise, may, and frequently do, combine to create chemical compounds capable of causing serious illness and even death; and that such gases are often carried great distances and are as vagrant as the shifting currents of air by which they are borne.

Except for the fact that defendant's waste burner was referred to in the testimony as being a ''stack'' which extended ''some 150 feet into the air'' the record is completely silent concerning the description, the construction, the condition, the functioning, or the modus operandi of this particular instrumentality, either at the time of the injury, or at any other time. Indeed, there is no proof that defendant's waste burner was in operation at the time in question. But assuming that it was in operation, there is not a scintilla of evidence tending to prove that it was functioning improperly. To sustain plaintiff's position would require a holding that a purely speculative assumption of irregularity may serve as a basis for invoking the mandatory inference of negligence.

In all cases, including those in which the res ipsa doctrine is properly invoked, the law consistently requires, as an indispensable condition of liability, evidence sufficient to support a legitimate inference that the defendant sought to be charged is probably responsible for the injury in question. Liability is never premised upon purely speculative assumptions. (*Reese* v. *Smith*, 9 Cal.2d 324, 328 [70 P.2d 933]; *Mc-Kellar* v. *Pendergast*, 68 Cal.App.2d 485, 489 [156 P.2d 950]; *Greene* v. *Atchison, T. & S. F. Ry. Co.*, 120 Cal.App.2d 135, 142 [260 P.2d 834, 40 A.L.R.2d 873]; *Puckhaber* v. *Southern Pac. Co.*, 132 Cal. 363, 365 [64 P. 480].) ''An inference cannot be based on mere possibilities; it has been held that it must be based on probabilities.'' (*Sanders* v. *MacFarlane's Candies*, 119 Cal.App.2d 497, 500 [259 P.2d 1010];

*Robinson* v. *Board of Retirement*, 140 Cal.App.2d 115, 118 [294 P.2d 724].)    Plaintiff's burden of proof is not met merely by proof that he was an invitee and that his injury was suffered on the invitor's premises. (*Oldenburg* v. *Sears, Roebuck & Co.*, 152 Cal.App.2d 733, 741 [314 P.2d 33]; *Vaughn* v. *Montgomery Ward & Co.*, 95 Cal.App.2d 553, 556 [213 P.2d 417].)

As stated in *Nelson* v. *Douglas Pedlow, Inc., supra,* 130 Cal.App.2d 780, at page 784: "The res ipsa loquitur doctrine is not intended to open the door for mere speculation as to the cause of an injury. Rather, it furnishes a formula which in a proper case, may justifiably lead to a natural inference of negligence on the part of one who is in actual control of the particular situation."

The judgment is affirmed.

Ashburn, Acting P. J., concurred.

Presiding Justice Fox, being disqualified, did not participate herein.